F. A. WHITT, Individually and as Executor of the Estate of Vlva I. Whitt, Deceased, Appellant and Appellee,

v.

John L. BUSSEY et al., Appellees and Appellants.

No. 11268.

Court of Civil Appeals of Texas.

Austin.

Feb. 24, 1965.

Rehearing Denied March 17, 1965.

Runge, Marschall & Hall, San Angelo, for appellant and appellee.

Snodgrass, Smith, Rose & Finley, San Angelo, Frank C. Dickey, Sr., Robert Lee, Lewis, Blanks, Thigpin, Logan & Steib, San Angelo, for appellees and appellants.

HUGHES, Justice.

F. A. Whitt is the surviving husband of Viva I. Whitt, who died testate on February 2, 1961. Mr. Whitt brings this suit individually and as Executor of the will of Viva I. Whitt, to construe such will. He also sues to cancel two deeds executed by him on December 12, 1961, conveying certain real property in Ector and Coke Counties, Texas, to John L. Bussey, Everett E. Bussey, Frank Henry Bussey and Ima Jefferson Flanigan, children of Viva I. Whitt by a previous marriage, and Alta Iolee Kennemer Caswell, Jack Shelby Kennemer, Gerald Frank Kennemer, Darwin Bussey Kennemer and Glenn Curtis Kennemer, children of Mrs. Ida Kennemer, a deceased daughter of Mrs. Whitt.

The persons above named as grantees in the two deeds sought to be cancelled and Frank Bryson Bussey, son of Frank Henry Bussey, were beneficiaries under the will of Mrs. Whitt and all are parties to this suit.

The ground upon which cancellation of the two deeds is sought was the undue influence exerted by the four children of Mrs. Whitt, above named, to procure their execution. Trial to a jury resulted in a verdict finding that undue influence was exercised by some or all of such children, and judgment cancelling such deeds was rendered.

We will determine the points relating to this phase of the case before construing the will of Mrs. Whitt.

The first point is that the court erred in including the name of Ima J. Flanigan as one of the persons named in the issue submitted to the jury as one who may have exercised undue influence upon Mr. Whitt.

This issue was timely objected to by the defendants on the ground that there was no evidence, or that the evidence was insufficient, to raise the issue that Mrs. Flanigan exercised or participated in the exercise of undue influence upon Mr. Whitt and that if the jury should answer such issue in the affirmative it could not be determined whether the answer of the jury, or one of the jurors, applied to her alone, and if so it would be a faulty finding.

The issue and answer read:

"SPECIAL ISSUE NO. 1. Do you find from a preponderance of the evidence that the making and execution of the deeds by F. A. Whitt on December 12, 1961, were procured by the exercise of undue influence on the part of John L. Bussey, Frank Henry Bussey, Everett E. Bussey and Ima J. Flanigan, or any of them? Answer yes or no.

"Answer: Yes"

It is our opinion that there was some evidence of probative force to the effect that Mrs. Flanigan exercised undue influence upon Mr. Whitt to procure the execution of the deeds by him, and that defendants' objections upon this score are untenable.

The deeds in suit were not executed for a consideration deemed valuable in law.

When they were executed Mr. Whitt was 68 years of age. He never attended school. He could only write his name and could read a little. He herded sheep, worked on a ranch, in an oil field, farmed and did other physical work for a living. Mr. and Mrs. Whitt married in 1914. Mrs. Whitt had been previously married and when she and Mr. Whitt married she had six children, all under the age of fourteen years, one dying at the age of six. Mr. and Mrs. Whitt also reared the five children of Mrs. Ida Kennemer who died in 1931. These children were then under nine years of age. Mr. and Mrs. Whitt also took one of Mr. John Bussey's children from an orphanage because he had kidney trouble, and they reared him. They also took in a needy unrelated boy and kept him while he went to high school.

Dr. W. Irby Fox, M. D., testified regarding the physical and mental condition of Mr. Whitt. Dr. Fox treated Mr. Whitt for heart trouble and palsy. We quote his testimony:

"Q  Doctor, what is your opinion then as to the psychiatric or the emotional makeup of this man?

"A  Well, from the psychiatric emotional makeup, I'd say he is, or rather has been a rather independent man most of his time, and of course it is obvious right now that he is in the late phases of his declining years and emotionally he is just like any of us, he will take the path of least resistance, it is going to cost him his life if he doesn't or if he is under pressure or if he is under tension he can't stand, his reserve is very low.

"Q  Would you consider a man of his caliber then normal or abnormal so far as this problem is concerned?

"A  I think he is normal, he is mentally clear, he exhausts easily and when you get him exhausted, why, of course, he is confused and would get confused and does.

"Q  Is he readily susceptible to any influence that may be exerted upon him?

"A  Yes, I think he is very susceptible because he is dependent now, he is not able to take care of himself, he has no fight left in him and he he is dependent on whoever promises to take care of him.

"Q  And knowing his medical history and knowing his condition now would you surmise that he has been in this same condition for at least several years in the past?

"A  I think so; this is not sudden."

The above evidentiary facts are relevant to the issue of undue influence as to the four persons named in the issue. We will not here detail the evidence of undue influence as it relates to any of the four Bussey children except as to Mrs. Flanigan, its sufficiency as to them not being challenged, and except as may be required to explain the testimony regarding Mrs. Flanigan.

Mrs. Whitt had made two wills, one in 1957 and one in 1959. After her death Mr. Whitt offered the 1959 will for probate but its probate could not be accomplished because Mrs. Flanigan had taken the will after her mother signed it to witnesses who lived elsewhere and had it witnessed in the absence of Mrs. Whitt. This will was much more beneficial to Mrs. Flanigan and the other Bussey and Kennemer children than the 1957 will which was probated. Regarding this 1959 will, Mr. Whitt testified:

"Q  Did Mrs. Whitt ever discuss this 1959 will with you?

"A  Yes, sir.

"Q  What did she say about it?

"A  Well, she told me that it wasn't any good.

"Q Did she say why she thought it was no good?

"A Yes, sir. She said that those people that signed, they didn't hear her testimony of that being her first and last will.

"Q Did she say why she had that will prepared?

"A Well, she had this will prepared, she said, because Ima Flanigan kept on her to make a new will, and change the old will, the way she had the old will made out she wanted it different.

"Q Did Ima ever tell you and Mrs. Whitt that she felt like she ought to have all that Odessa property?

"A Yes, sir.

"Q Did she say why she felt like she was entitled to all the Odessa property?

"A Well, she said that she lived with us and taken care of us as long as we lived she'd like to have that Odessa property made over in her name.

"Q All right. Mr. Whitt, did Ima Flanigan take care of you from there on out?

"A No, sir.

"Q And you have already testified that she had not contributed to your support. Did she begin to contribute to your support then?

"A No, sir.

"Q Did she and her husband continue to live with you and Mrs. Whitt in that house?

"A Well, for a while she stayed up there with us. I don't remember just how long."

Mr. Whitt was not permitted to remain in the room with his wife, the attorney and Mrs. Flanigan when the 1959 will was drawn. He was excused by the attorney who stated that when the time came to probate the will someone might say he, Mr. Whitt "caused her to make it this way."

Mr. Whitt received nothing under this will. All of Mrs. Whitt's property, except certain personal property which was bequeathed to Mrs. Flanigan, was left to the children and certain grandchildren of Mrs. Whitt. Mrs. Flanigan was named Executrix.

Under the 1957 will the children of Mrs. Whitt and the children of a deceased daughter received[1] 206 acres of land in Coke County subject to the provision that all mineral royalties from such land should go to Mr. Whitt for life. Mrs. Flanigan in addition to receiving a $\frac{1}{5}$ interest in the 206 acres was bequeathed certain household effects. All the remaining property of Mrs. Whitt was left to her husband and he was named Independent Executor of her will.

When Mrs. Whitt died she and her husband, either separately or jointly, owned a house and lot in Odessa, Texas, for which they had paid $12,000.00, a note representing the sale of their farm in Missouri (Dombrowsky note) on which $10,000.00 was owing, and 532.87 acres of land lying principally in Coke but partly in Mitchell County, less some of the minerals on part of the land, and certain mineral interests in New Mexico of nominal value.

The deeds which were set aside by the Court on the jury verdict conveyed, one, a one-half interest in the house and lot in Odessa to the defendants, except Frank Bryson Bussey, and the other, to the same parties, the 532.87 acres of land in Coke and Mitchell Counties. This latter deed contained no reservation of oil royalties to the grantor, Mr. Whitt.

1. The validity of this devise is the subject of the second phase of this appeal.

With this background, we now recite the evidence directly connecting Mrs. Flanigan with the undue influence found by the jury to have been practiced on Mr. Whitt.

In the fall of 1961, Mr. Whitt was in Texas visiting with his granddaughter, Mrs. Dorothy Rannefeld, the daughter of John Bussey, when John and Frank Bussey came to see him and tried to persuade him to return to Missouri. Mr. Whitt at first refused, but the next day changed his mind, giving the following reasons:

"Q What made you change your mind and go on up to Missouri?

"A Well, I had the place down here leased, you know; and my lawyer up there at Neosho said—he had a contract made that I hadn't signed, and on leasing the place—

"Q Was there any other reason that you wanted to go back up there?

"A Well, yes sir.

"Q What?

"A I thought if I'd go back up there I wouldn't have so much depression on me, being depressed. I was trying to get out from under it.

"Q Well, what was depressing you down there at Roscoe?

"A Well, John and Judge [Frank] and Mrs. Flanigan wanting me to go back to Missouri and have that will fixed up, and they wanted me to deed it all over to them, and John said if I'd go up there with him, well, he had a truck that he could haul all of my things back, and he had a way of getting along with Everett and he knew that he'd get the things.

"Q Well, were John and Frank angry or were they pleased with you when you refused to go back with them?

"A Well, they wasn't pleased.

"Q Well, were you concerned about what John and Frank might do?

"A Yes, sir.

"Q What were you concerned with?

"A Well, I was afraid if I didn't sign these here deeds—

\*  \*  \*  \*  \*  \*

"Q Were you worried about what John and Frank might do?

"A Yes, sir.

"Q What did you think they might do?

"A Well, I thought they might strike me, you know, if I didn't carry on things like they wanted me to.

"Q Well, had you known the Bussey boys to be of such character that they were apt to do this sort of thing?

"A Yes, sir."

We quote again from the testimony of Mr. Whitt:

"Q What prompted you to sign those deeds, Mr. Whitt?

"A. Well, this nagging that was going on, and the depression by them, and I didn't have anyone up there with me. I was by myself. There was four of them there, you know, and I couldn't argue against four, and I was the only one. I didn't have anyone to help me and I was so depressed on losing my wife and her brother and my brother and her sister-in-law, and then this coming up on me too. I didn't know what to do, and I decided to get them off my back and get away from them, and I just signed it over to them.

"Q Was there any other reason why you signed them?

"A No, sir.

"Q Were you concerned about your property?

"A Yes, sir, I was.

"Q In what way?

"A Well, I felt like I needed that property, and it was mine and that's the only thing I had in the way of getting any money.

"Q Are you referring to this Dombrowsky note?

"A No, sir, I'm referring to the Silver, Texas property.

"Q Well, this is the property you deeded, but were you concerned with losing all of your property?

"A Oh, yes, sir; that's right."

There is also testimony that after the deeds were executed by Mr. Whitt, Mrs. Flanigan helped her brothers John and Frank in trying to persuade Mr. Whitt to sell the Odessa house for $2500.00 less than was paid for it. They went to Roscoe, Texas where Mr. Whitt was staying with Mrs. Dorothy Rannefeld who testified to this conversation between Mr. Whitt and Mrs. Flanigan:

"Q During the course of this conversation was there anything said about the minerals on the Coke County land?

"A Well, yes, sir. Mrs. Flanigan made the remark, she asked Mr. Whitt if he wasn't satisfied, and said they was glad for him to have the minerals in Coke County as long as he lived, and I told Mrs. Flanigan that they had all the minerals the way it stood at that time, and she got pretty unhappy about what I said; and we went on to Sweetwater then."

Mr. Whitt testified similarly:

"Q Was there any discussion there in regard to the minerals?

"A Yes, sir, there was.

"Q What?

"A Well, Ima Flanigan said they were willing for me to have the oil checks, but it wasn't on the contract and it wasn't on the deed.

"Q Well, was this said as a matter of getting you to sign the contract to sell the house?

"A I imagine that's right."

It is our opinion that this evidence is more than a mere scintilla of evidence tending to show that Mrs. Flanigan participated with her brothers in overcoming the will of her stepfather and in procuring his execution of the deeds in suit. Mr. Whitt testified that he executed the deeds because of his depressed condition and to "get them off my back." By "them" he referred to the "four" who were against him. By the "four" he meant the three Bussey boys and Mrs. Flanigan.

The point under consideration is overruled.

The second point is that the trial court erred in not instructing the jury, as requested by defendants, that it could not consider as undue influence any declaration by any defendant that he would, or intended, to contest the will of Mrs. Whitt, and that "It is not wrongful or improper to institute or threaten to institute a civil suit or take proceedings in court or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights."

There is evidence that some of the defendants told Mr. Whitt that if he did not execute the deeds in suit that they would contest the 1957 will of Mrs. Whitt. This testimony went in without objection.

The court, in its charge, defined "undue influence" as follows:

"The term 'undue influence' as used in this charge means such influence or dominion of one over the mind of another created by excessive persuasion,

importunity, imposition or threats exercised at the time of signing the instrument or theretofore exercised and still operating on the signer's mind to such an extent that it destroys the free agency of the person signing the instrument and substitutes therefor the will of another."

This charge, or instruction, was not objected to on the ground that it contained the word "threats."

We quite agree with defendants that a threat to do what one has a legal right to do is not wrongful. We do not agree, however, that there was error in refusing the requested instructions.

The threats to sue were harmless threats. The threats which were calculated to destroy the free agency of Mr. Whitt to exercise his own will in giving or not giving this property to defendants were of an entirely different character. We quote the testimony of Mr. Elgin Rannefeld regarding a visit made to his home in Roscoe, Texas, by John and Frank Bussey and John's son, in the fall of 1961, at a time when Mr. Whitt was staying with the Rannefelds:

"A   Yes, sir—I mean Frank and John.

"Q   Go ahead.

"A   And John's son came by the house, or came to the house, they had been there on several occasions. They wanted him at that present time to go to Missouri with them to settle all this estate up there, and I believe that's the particular time. They came about a half a dozen times there.

"Q   And were they inside your house with you and who all was in the house at the time they were there?

"A   Well, Charles and my wife, and I believe one of my sons was there.

"Q   And were Frank and John in the house all at the same time?

"A   Yes.

"Q   Do you recall the course of the conversation that took place then?

"A   Well, they told him if he didn't get out to Missouri—they told him they thought they deserved all the Texas property, or they wanted all the Texas property is what they said, and they wanted him to go to Missouri and get all that settled up, all the estate settled, and they said if he didn't go that he'd lose everything he had.

*   *   *   *   *   *

"Q   Mr. Rannefeld, aside from what you thought, and I don't think you were testifying as to what you thought, just state very clearly what was said by John Bussey and Frank Bussey there in the living room.

"A   Well, they said that if he didn't get up to Missouri and get this settled up that he was going to lose everything he had including the notes he held on the Missouri place up there.

"Q   Did John and Frank Bussey appear to be angry?

"A   Well, they were most domineering about it.

"Q   And how did this impress Mr. Whitt? What were Mr. Whitt's apparent reactions to this discussion?

"A   Well, it was a while before Thanksgiving and we tried to get him to stay, but he felt he had to get up there right then or he would lose it.

"Q   And did he leave the next day?

"A   Yes, sir, he did.

"Q   To go back up to Missouri?

"A   Yes, sir."

Just a few weeks before Thanksgiving in 1961, John and Frank Bussey made another trip to Roscoe to see Mr. Whitt who was there. Mrs. Rannefeld testified regarding this visit as follows:

"Q   What was the condition of Mr. Whitt when he arrived at your place in Roscoe?

"A   Well, he seemed very depressed and just nervous and unhappy; he just seemed like in a mental state of depression.

"Q   And did you have a visit thereafter by Mr. John Bussey and Frank Bussey at your home while Mr. Whitt was still there?

"A   Yes, sir.

    *     *     *     *     *     *

"Q   That was the time that Mr. Whitt and Elgin and Mr. Charles Blair were there and you?

"A   Yes.

"Q   And then Frank Bussey and John Bussey came there?

"A   Yes.

"Q   What happened in the course of that visit?

"A   Well, they came by I understood to take him to Missouri to finish up some—this will, whatever they needed to finish up the probate or something of the will, and come by and wanted him to go with them that day.

"Q   Did he accept or reject that—

"A   No, he told them he didn't want to go with them.

"Q   And what happened after he said that?

"A   Well, John Bussey became extremely angry, and he just put his hands in his pocket and got up and began to walk back and forth across the floor, and he told Mr. Whitt if he didn't go and finish up this process that there was going to be some trouble, they were unhappy over some land, they thought they should have had all this land in Texas; and Mr. Whitt told them that he couldn't give them this land, and they were quite unhappy over it and told him that if he didn't give them this land in Texas that they were going to see to it that he would lose everything that he had, including some notes that he was getting from Missouri, that was the sole income that Mr. Whitt had, and they told him also that they would also see that he lost these notes in Missouri.

"Q   And did Mr. Whitt go at that time with them to Missouri?

"A   No, he didn't go with them but, I'm not sure whether it was the next day, Mr. Hall, just the next day or two we put him on the bus and sent him to Missouri."

There is also testimony that Mr. Whitt was cursed by Everett Bussey and invited by him to engage in physical combat in an argument over the deeds and just prior to their execution. Everett Bussey was 6'1" high, weighing 180 pounds and was 53 years old. Mr. Whitt weighed 120 pounds. Everett Bussey testified in person on the trial and did not deny any of this testimony.

If defendants were entitled to an instruction that the mere bringing of a suit cannot be considered as undue influence, then Mr. Whitt would have been entitled to an instruction that the above testimony could be considered as undue influence. The result of this would be that each scrap of evidence could be singled out for a

negative or affirmative instruction on this issue. See Johnson v. Zurich General Accident and Liability Ins. Co., 146 Tex. 232, 205 S.W.2d 353, where the Court stated: "A holding that a trial court must give a charge on that question of law [circumstantial evidence] would logically be followed by holdings that charges of similar character with respect to many other questions of law should also be given. Such practice would be out of harmony with the purposes of trials on special issues."

Rule 277, Texas Rules of Civil Procedure, provides, in part, that in submitting special issues the Court shall submit such "explanatory instructions * * * as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues * * *."

Rule 273, T.R.C.P., provides, in part, that, "Each party may present to the judge and request such written instructions * * or explanatory instructions, as he desires to be given to the jury; and the judge may give them or a part thereof, or he may refuse to give them, as he may see proper."

Regarding Rule 277, Mr. McDonald in Sec. 12.14 of his work on Texas Civil Practice states:

"The rule perhaps may be generalized: that when the special issue involves any unusual fact situation which brings into operation rules of law which the jurors must understand to act intelligently upon the question submitted, but which can not be covered adequately in a formal definition, the court may give an explanatory instruction correctly stating the rules of law, provided he does not thereby comment on the weight of the evidence or inform the jurors as to the effect of their finding upon the judgment."

Regarding Rule 277, Mr. Hodges in Sec. 8 of his work on Special Issue Submission in Texas states, in speaking of giving "explanatory instructions" in a charge, that, "The Trial Court has considerably more discretion in this area than it has in connection with the special issues."

It is our opinion that the explanatory instructions requested here were not "necessary" under Rule 277, and that the trial court properly exercised the discretion given him under Rule 273 in declining to give such instructions.

To have given these requested instructions would have bordered on violating the rule that a court should not comment on the weight of the evidence, a question we need not decide because the evidence that some of the defendants threatened to contest the will of Mrs. Whitt is so intermingled with their threats to pauperize this illiterate man that the jury could easily have been confused by such instructions.

The instruction was unnecessary because, in our opinion, a Coke County jury does not need to be told that a person has a right to enforce or protect his rights in the courts of the land.

The point under consideration is overruled.

Defendants' third through eleventh points of error are jointly briefed. They complain of the action of the trial court in overruling numerous exceptions to the pleading of Mr. Whitt.

The gist of these exceptions is that conclusions, not facts, were pleaded and that the allegation that the certain defendants "threatened to cause plaintiff to lose everything of value that he possessed if he did not make the conveyance" was subject to exception because, "It is not alleged that such threat, if made, was the producing cause of plaintiff's execution of the deeds nor that defendants had it within their power to cause such a loss to plaintiff."

We quote the following from the Trial Petition of Mr. Whitt:

"During the time Plaintiff resided with the said Everett E. Bussey, in Neosho, Missouri, Responsible Defend-

ants commenced, continued and consummated a harsh and cruel course of conduct toward Plaintiff, involving abuses, threats, cursings, intimidations and insults, interspersed with overtones of kindness and solicitation, in an attempt to compel Plaintiff to convey to Defendants all his rights, title and interest in that real property, including all oil, gas and other minerals, interest in and to certain tracts of land in Coke, Ector and Mitchell Counties, Texas, the full description of which is set forth in Exhibit A attached hereto for all purposes. In more specific terms, Responsible Defendants often treated Plaintiff like a child in issuing directives and mandates, Responsible Defendants insulted Plaintiff regularly by degrading him personally and by excluding him from social company, Responsible Defendants cursed Plaintiff with vile and vulgar language in connection with various conversations and remarks, and Responsible Defendants not only threatened Plaintiff physically by inviting him, an elderly and feeble man, to fight one of them, to-wit: Everett E. Bussey, a strong and healthy man considerably younger than Plaintiff, but Responsible Defendants also threatened Plaintiff with the loss of everything he owned and possessed if he did not convey the subject property to the Defendants. In addition to these positive and overt acts committed by the Responsible Defendants, they did further exert duress and undue influence by subtle innuendoes and implications to the same matters and to the same effect. These acts, both overt and implicated, were coupled with a constant course of nagging Plaintiff by the Responsible Defendants to convey to the Defendants the subject property, and these acts continued over an extended period of many months.

"(9) As a result of such harsh and cruel treatment, Responsible Defend-

ants exerted such duress, undue influence and breach of their fiduciary relationship with and upon Plaintiff that Plaintiff, against his own free will and election, did in fact convey to Defendants all his rights, title and interest in said real property described in Exhibit A, including his own one--half community property interest there--in,

＊　＊　＊　＊　＊　＊

Such duress and undue influence were exerted at the time the deeds were executed and were of such a nature as to subvert Plaintiff's mind and will power so as to render him unable to resist it or to act upon his own free agency and election. The deeding by Plaintiff reflected, as a result of such duress and undue influence, the will of Responsible Defendants rather than the free will of Plaintiff. Immediately preceding and at the time of deeding by Plaintiff, the Responsible Defendants threatened to cause Plaintiff to lose everything of value that he possessed if he did not make the conveyance to the Defendants."

■ It is our opinion that the pleadings were sufficiently specific as against the exceptions taken to them and that they gave "fair notice" to defendants of the grounds for the suit. Rule 45, T.R.C.P. Most of the allegations were with reference to matters which, if true, were within the peculiar knowledge of one or more of the defendants, who make no contention that they were surprised by the introduction of any testimony. It thus appears that if there was any deficiency in the pleading as asserted, that no harm resulted from it; hence, reversal should not follow. Rule 434, T.R.C.P. See Rothermel v. Duncan, 365 S.W.2d 398, Beaumont C.C.A., reversed on other grounds, 369 S.W.2d 917.

■ With reference to the specific exception, above noted, it is our opinion that the pleading alleged all of the ingredients

of undue influence required to be established in order to set these deeds aside. We do not find, from the decisions, that the words "producing cause" are used in defining undue influence. We will not disturb the definition used by the Court which has stood the test of time. We hold that Mr. Whitt was not required to plead that certain acts were the "producing cause" of the execution of the deeds by him.

■ We also hold that Mr. Whitt was not required to allege that defendants had the power to cause him the loss of everything he possessed. It is the effect of this threat, if any, upon the mind or will of Mr. Whitt which is involved. This was fully pleaded.

We overrule points three through eleven.

Having disposed of all of the points presented by defendants seeking reversal of the judgment cancelling the deeds in suit adversely to them, we affirm the judgment of the trial court in this respect.

Mr. Whitt, as appellant, complains of the construction which the trial court placed upon the following provisions of the will of Viva I. Whitt, the probated 1957 will:

"*SECOND*: I own, as my separate property and estate, having inherited same from my mother, Louisa Mathers, approximately two hundred six (206) acres of land, situated in Coke County, Texas, and I hereby Devise and Bequeath same as follows:

"(a) An undivided one-fifth (⅕th) interest in same to my son, John L. Bussey.

"(b) An undivided one-fifth (⅕th) interest in same jointly to my son, Frank Henry Bussey, and his son (my grandson), Frank Bryson Bussey.

"(c) An undivided one-fifth (⅕th) interest in same to my son, Everet E. Bussey.

"(d) An undivided one-fifth (⅕th) interest in same to my daughter, Ima Jefferson Flanigan.

"(e) An undivided one-fifth (⅕th) interest in same jointly to my grandchildren (being the children of my deceased daughter, Ida Mae Kennemer), Alta Iolee Kennemer, Jack Shelby Kennemer, Gerald Frank Kennemer, Darwin Bussey Kennemer and Glenn Curtis Kennemer.

The records of said county are referred to for a proper description of said property, as I own in community with my husband other real property situated in said county.

"*THIRD*: The bequests next above made are subject, however, to the provision, here now made, that all royalties on account of oil, gas or other minerals from said lands shall go, and are hereby devised, to my husband, F. A. Whitt, so long as he shall live, and upon his death same shall cease as to him, and the title to same shall follow the devises next above. During his life my said husband, F. A. Whitt, shall have the sole and exclusive right and power to lease said lands for oil, gas and other minerals.

\*   \*   \*   \*   \*   \*

*FIFTH*: All of the rest, remainder and residue of my property, whether real, personal or mixed, of whatsoever kind or character, or wherever located or situated, I Give, Devise and Bequeath to my husband, F. A. Whitt."

The trial court made the following findings in his judgment and, based on such findings, construed such will as shown below:

"The Court finds that Louisa Mathers was the mother of deceased, Viva I. Whitt; that the said Louisa Mathers died and that under her will the said Viva I. Whitt received an undivided ⅒ interest in 2065 acres of land in

Coke County, Texas; that the said Viva I. Whitt and husband, F. A. Whitt considered same as being 206 acres of land inherited by the said Viva I. Whitt from her mother; that on January 13, 1932, Viva I. Whitt and Husband F. A. Whitt conveyed said undivided ⅒ interest in 2065 acres of land to S. B. Savage by deed recorded in Volume 53, Page 102, of the Deed Records of Coke County, Texas, as part payment for certain land in Coke County, Texas, that is, the Alex Barnhill Survey, Patent No. 203, Volume 26, dated January 6, 1894, Abstract 1215; 148⅔ acres out of the West part of Survey No. 10, Isaac Reed, Patent No. 559, Volume 25, dated September 14, 1893, Abstract 1100; and 11⅓ acres out of the Northwest part of Survey No. 11, Isaac Reed, Patent No. 456, volume 29, dated September 7, 1897, Abstract 1286; all described in the deed from S. B. Savage and wife, Letitia Savage, to Viva Whitt, dated January 13, 1932, recorded in Volume 53, Page 100, Deed Records of said County, to which reference is made for all the terms and conditions of said deed.

"The Court further finds that after said exchange of deeds dated January 13, 1932, the said Viva I. Whitt and husband, the said F. A. Whitt, considered an undivided 206 acres of the land so conveyed to Viva I. Whitt on January 13, 1932, as having been inherited from her mother; and, that the land referred to by Mrs. Whitt in paragraph 'Second' of her will dated August 21, 1957, was and is an undivided 206 acres in the three tracts described above (the Alex Barnhill Survey, 148⅔ acres out of Survey 10, Isaac Reed, and 11⅓ acres out of Survey 11, Isaac Reed).

\* \* \* \* \* \*

"That paragraph No. 2 of said will dated August 21, 1957, be and the same is construed to refer and pass the title to an undivided 206 acres of land in said three tracts of land specifically described above, that is, the Alex Barnhill Survey, said 148⅔ acre tract out of Survey 10, Isaac Reed, and the said 11⅓ acre tract out of Survey 11, Isaac Reed, except as provided in paragraph 3 of said will, and subject to such oil, gas and other minerals therein as are outstanding in third parties."

It is obvious from these findings that testatrix when she made her will did not own 206 acres of land in Coke County which she inherited from her mother. She owned the land or an interest in the land which she received in trade for the 206 acres inherited from her mother.

The pleadings upon which the parties went to trial, with respect to the construction of the will of Mrs. Whitt, show the following:

Mr. Whitt pleaded the history of the 206 acres of land (⅒ of 2065 acres) inherited by his wife from her mother as shown in the findings of the Court, supra. He prayed for a declaratory judgment, "as to the lack of any right of Defendants, or any of Defendants, to receive any interest in the real property of the Estate of Viva I. Whitt, Deceased, by and under the last will and testament of the said Viva I. Whitt, deceased, dated August 21, 1957."

In Defendants' (except the son of Frank Bussey) pleading, they alleged the following:

"The deceased, Viva I. Whitt, wanted her heirs to have a substantial part of her estate. At the time she executed the will dated August 21, 1957, she did not own any 206 acres of land inherited from her mother, Louisa Mathers, and the recitation to that effect in said will was wholly in error. She had inherited an undivided one-tenth (⅒) interest in approximately 2065 acres of land in Coke County, Texas, but in the year 1932 had conveyed the same to S. B. Savage in part

consideration for 320 acres, being Tracts One, Two and Three of the land described in Exhibit A attached to Plaintiffs Petition herein, and the will therefore was ineffective to pass title to the 206 acres therein mentioned and probably was ineffective to pass title to any land whatsoever to her children and the five grandchildren named in her will."

This pleading was never amended. It was read to the jury. Obviously, it could have been the basis of an argument to the jury that if the deeds in suit were set aside these defendants would receive nothing from the estate of their mother.

■■ We are of the opinion that the allegation that Mrs. Whitt "did not own any 206 acres of land inherited from her mother, Louisa Mathers," was a statement of fact constituting a conclusive judicial admission against these defendants, the effect of which is that Mrs. Whitt did not own the land which she purported to devise to these defendants. The rule as to admissions of fact stated in a current pleading is that, "As long as the pleading remains unamended or the admission stands unretracted, the fact alleged or admitted, for the purposes of the case, is accepted as true by the court and jury and binding on the party making it, i. e. he cannot introduce evidence to contradict it."

■ Under this rule, the parol evidence admitted to identify other property as the property which Mrs. Whitt referred to as the 206 acres of land inherited from her mother was inadmissible and cannot form a proper basis for the Court's construction of the will.

■ There is another rule which precludes the admissibility of such parol evidence. This is the rule that if a will, in clear and unambiguous language, evidences the intention of a testator to devise a par-

ticular tract of land, parol evidence is inadmissible to show that the testator intended to devise a different tract of land. This is the holding in Davis v. Douglas, 15 S.W.2d 232, Tex.Comm. of App.

■ The devise to these defendants of 206 acres of land in Coke County, inherited by Mrs. Whitt from her mother, Louisa Mathers, and referring to the County records of Coke County for a proper description of such lands is a specific devise of such lands. The records of Coke County show that the will of Louisa Mathers was recorded in Coke County December 10, 1917. This will shows that Mrs. Whitt was devised a one-tenth interest in all real estate which her mother owned at her death. Such records also show that in 1932 Mrs. Whitt conveyed to S. B. Savage her undivided one-tenth interest in 2066.2 acres in Coke County, specifically described, which was owned "by virtue of the said Viva Whitt, being one of the heirs of L. R. Mathers, and L. V. J. Mathers, deceased."

There is no ambiguity in the wording of the will in regard to this devise and there is no latent ambiguity in such devise created by the records of Coke County, reference to which is made in the will.

It is our opinion that the trial court erred in his construction of the will of Viva I. Whitt. The devise of the 206 acres of land to these defendants was ineffective because the testatrix did not own such lands at the time of her death. Neither this Court nor any court, has the moral or legal right to re-write the will of any person. These defendants took no interest in the lands of testatrix under her will, and judgment to such effect is here rendered.

The judgment of the trial court is affirmed in part and in part reversed and rendered.

Affirmed in part and in part reversed and rendered.