**NATIONAL FARMERS ORGANIZATION, Appellant,**

v.

**J. O. SMITH, Appellee.**

No. 989.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 29, 1975.

R. D. Cullen, Cullen, Carsner & Williams, Victoria, for appellant.

W. S. Fly, Fly, Moeller & Stevenson, Victoria, for appellee.

## OPINION

NYE, Chief Justice.

This is a suit for damages based on a breach of contract between farmer J. O.

Smith and the National Farmers Organization (called NFO hereafter). The farmer agreed to sell his milo grain to NFO and intentionally failed to deliver a substantial portion of the grain. The NFO sought damages from the farmer (as an offset to an amount NFO owed the farmer). NFO appeals from a portion of the trial court's judgment which held adversely to NFO's contentions.

The NFO is an agricultural cooperative organization organized under the Capper-Volstead Act. (See U.S.C. Title 7, Section 291) The Act provides for an association of persons engaged in the production of agricultural products to collectively process, handle and market such products in interstate and foreign commerce. It also engages in collective bargaining to protect farm prices. Smith, the farmer, had engaged in farming for a number of years and had not been a member of NFO until 1973.

On January 9, 1973, Smith signed a contract labeled "Bill of Sale". It is commonly referred to as a "forwarding contract". Its purpose is to assure the farmer of a fixed price for his grain to be delivered at a future date after it has been harvested. The pertinent portions of the contract were as follows:

"BILL OF SALE

*New Member*

KNOW ALL MEN BY THESE PRESENTS: That this contract is entered into on the date shown below between National Farmers Organization, hereinafter called NFO, and J. O. Smith of Victoria Texas, 3602 Meadow Lane, *a member of NFO.*[1]

In consideration of their mutual promises and the mutual promises of other NFO members, the undersigned member and NFO agreed that NFO on behalf of its members has entered or will enter into a

---

1. Emphasis supplied throughout.

contract and has sold or will sell to NFO Negotiated Buyers and that the member has sold or agrees to sell under this contract as of this date the following production:

| KIND | CLASS OR VARIETY | QUANTITY | APPROXIMATE DELIVERY DATE |
|------|------------------|----------|---------------------------|
| Milo | #2 | 1,200,000 lbs | July–Aug. |

The member shall not dispose of his production thus committed, contrary to this agreement. *For failure to deliver under this contract, member agrees that such act will damage NFO* in an amount that is and will be impracticable and very difficult to determine and fix and, therefore, *the member agrees to pay NFO 25 percent of the gross value of the production so committed as liquidated damages for all the production that is disposed of contrary to this agreement.* Said damages may be recovered by NFO in any court of competent jurisdiction. In any suit based on this agreement, the NFO, if the prevailing party, shall be entitled to reasonable attorney fees and all costs of any such suit."

The agreement was executed on the 9th day of January, 1973, and was signed by Smith and an official of NFO.

On January 10, 1973, NFO entered into a contract with Goodpasture, Inc. wherein Goodpasture was to purchase from NFO 33 million pounds of # 2 milo grain at $3.00 per hundred weight to be delivered at Corpus Christi or Houston, Texas, sometime between July 1 through August 31. This contract was numbered *AU7050FG.*

On January 17, 1973, NFO notified Smith that it had committed Smith's grain to Goodpasture, Inc. The contract notifying Smith of such arrangement in pertinent portion reads as follows:

"SUBJECT: *Official Contractual Notification*

Dear NFO Member,

On *1–9–73* you committed for NFO Block Sale on the Bill of Sale, 1,200,000 lbs of milo. A sale has been made on all of your grain on this Grain Contract for Sale, and you are expected to deliver 1,200,000 lbs of milo grain to Goodpasture, Corpus Christi or Houston, Texas.

CONTRACT TERMS: Delivery period: July/Aug./Sept. 1973; Delivery point: *By May 1st this office must be notified as to whether you ship to Corpus Christi or Houston.*

Sale Basis:

$3.00 cwt . . .

The contract number for your grain is *AU 7050 FG . . ."*

On January 20, 1973, Smith executed another Bill of Sale with NFO similar to the one executed on January 9, 1973. This contract called for 500,000 pounds of milo grain. The damage portion of the contract was different, however. It reads as follows:

"It is understood that I will not dispose of my production thus committed, contrary to this agreement. It is understood by me that this is a legal and binding document and that if I start moving my production thus committed in any other manner than that defined in this agreement the NFO, its elected officials, representatives, or members shall and will seek a court injunction to prevent any violation of this agreement or its intent and I agree to stand and be responsible for any and all court costs, attorney fees, or any other costs involved in this action. I also understand I will be liable for any damages caused by my failure to comply with this contract."

On January 30, 1973, NFO again notified Smith that his prior commitment on the grain contract for sale of 500,000 pounds of milo was to be delivered to Goodpasture, Inc. to either Corpus Christi or Houston, Texas, at $3.20 cwt.

Later, presumably before May 1st, Smith ratified the two contracts by notifying NFO that he would be delivering the grain in accordance with the contracts to Corpus Christi rather than Houston, Texas. This agreement reads as follows:

"Delivery Point Intentions

I have the following milo contracted for sale through NFO to Goodpasture:

| Contract | Price | Amount | Must be delivered by |
|----------|-------|--------|----------------------|
| AU7050FG | $3.00 | 1,200,000 lbs | August 31, 1973 |
| AU7148FG | $3.20 | 500,000 lbs | September 30, 1973 |
| Total | | 1,700,000 lbs | |

As per our contract arrangements, I am hereby notifying you that I plan to ship 1,700,000 pounds to ~~Houston~~ and/or Corpus Christi pounds to Corpus Christi Public Elevator.

/s/ J. O. Smith
J. O. Smith"

Smith produced enough grain during the year 1973 to fulfill both contracts and he still had a substantial amount of grain left to market individually. The record shows that prior to Smith's joining the NFO in 1973, he had never sold his grain production for more than $2.20 per hundred weight. However, in 1973, the grain market went up at the most rapid pace in its history. Smith decided that he wanted out of his contracts. He consulted his attorney and decided to breach the first contract calling for delivery of 1,200,000 pounds of milo grain, at $3.00 per hundred weight, and to fulfill the January 20, 1973 contract for 500,000 pounds of grain at $3.20 per hundred weight. In his deposition, Smith was asked about the signing of the two contracts:

"Q  So that in January of '73 $3.00 and $3.20 looked awfully good because you didn't know what was going to happen in '73, is that not correct, sir?

A  Well, it looked good, yes, sir.

Q  But it got so high that you decided that you would be better off not to deliver under this contract for $3.00, right, sir?

A  I would say that I decided to pay my damages.

Q  Whatever they may be. Or however we calculate them, or however the Court calculates them, right?

A  Yes, sir."

It was not until after Smith had sold all of his grain that NFO learned that Smith was not going to fulfill his contract. NFO then refused to pay Smith the amount due Smith under his January 20, 1973 contract contending that the amount NFO owed Smith was offsetted by the damage caused by Smith's breach of his January 9, 1973 contract. Whereupon Smith brought suit against NFO for the amount due and owing. NFO admitted owing Smith $13,744.00 due under its January 20th contract, but claimed as an offset therefrom of $12,600.00 as damages, that being 25% of the gross value of the production committed under Smith's contract of January 9, 1973. Smith sold his grain for $4.20 per hundred weight which was the amount determined by the trial court as "gross value of the production".

After NFO answered Smith's suit which claimed the offset, Smith filed an amended petition in which he made a judicial admission, which we discuss later:

"Plaintiff thereupon elected not to fulfill the contract dated January 9, 1973, *but to pay the penalty provided for in the contract,* and elected further to fulfill the contract dated January 20, 1973."

At another place in his amended petition, he stated:

"V

The Defendant knew that Plaintiff had elected not to fulfill the contract of January 9, 1973, and that he stood ready to pay the penalty. In fact, on September 25, 1973 the General Counsel of Defendant advised, 'Today I instructed our office at Seguin to pay J. O. Smith for the grain delivered and to bill Mr. Smith for the amount of the loss caused by his failure to deliver the balance on the contract'."

Smith admitted executing all of the agreements hereinbefore set out. However, as a defense, he claimed that on January 12, 1973, he entered into a "Partnership Agreement" with NFO which by its terms limited his damages to 10% of the gross sale of his production. It is this figure that Smith contends is the correct damage figure rather than the 25% which is stated in the January 9, 1973 contract.

■ Smith argues on appeal and the trial court agreed and found that the contract of January 9, 1973 was superseded by the membership agreement of January 12th. In Section 2 of Article VII of the agreement is the following:

"Sec. 2—When a contract has been consummated in accordance with the terms of this agreement covering a member's commodity, and he sells this commodity to a processor other than the one specified by the agreement, the member shall be assessed 10% of the gross sale of the commodity for liquidated damages."

We disagree with the trial court's holding and reverse and render a portion of its judgment.

The original contract of January 9th and the subsequent confirmation and ratification agreements made up one transaction, separate and apart from the membership agreement. NFO, in reliance upon the January 9th agreement, committed the 1,200,-000 pounds to Goodpasture, Inc. Goodpasture, Inc. agreed to purchase the grain for $3.00 cwt on its contract number "AU7050FG". NFO notified Smith that the price of its grain previously committed on January 9, 1973 was sold for $3.00 and that it was to be delivered to Goodpasture, Inc. It referred to the Goodpasture contract by number "AU7050FG". Thereafter, Smith ratified the January 9th agreement at $3.00 per cwt of 1,200,000 pounds and agreed to deliver the grain to Goodpasture. Smith made reference to NFO and Goodpasture's contract commitment number "AU7050FG". This completely tied all of the contracts and agreements together and bound Smith to the January 9th agreement.

■ There are other reasons that bound Smith to the January 9th contract. The membership agreement which was dated January 12, 1973 exempted prior marketing contracts. The agreement under Article I "Authorization" states in part that:

"I authorize the National Farmers Organization (hereinafter referred to as the N.F.O.) its agents or representatives to act for me as my·exclusive representative in collective bargaining in respect to all commodities marketed from my farm, *with the exception of those commodities presently covered by other marketing contracts.* . . ."

Section 1 of Article VII of the membership agreement permits the farmer to market his grain as he chooses until such time as certain prerequisites have taken place. Section 1 reads as follows:

"Sec. 1—Until such time as a contract has been consummated with the processor for a commodity I own or control in accordance with the provisions of this agreement; or until a marketing procedure has been established for a commodity and ratified *in accordance with the terms of this agreement, a member shall be free to market his commodity as he chooses.*"

There was no evidence in the record that these conditions had been fulfilled or complied with.

In Articles IV, V, and VII of the membership agreement, there were other prerequisites before the membership agreement was to go into effect. There was no evidence by either party that Smith or the NFO had complied with these conditions precedent. In Article VII, for instance, Smith was required to show that he had a contract which had been consummated in accordance with the membership agreement. Since the membership agreement was executed after the contract had been made, this condition could not be fulfilled.

The contracts of January 9th and 20th do not incorporate any of the terms of the membership agreement nor do these contracts make reference to such agreement. These contracts stand on their own. The membership agreement makes no reference to the January 9th contract, but specifically excludes it since it was a prior agreement. The Federal Act provides that either a member or nonmember may sell its farm products through the cooperative marketing organization, so that Smith's membership or his nonmembership was immaterial to the first contract which Smith signed on January 9, 1973.

■ It is true if there has been a true modification of an original contract, then the terms of the latest contract prevail. 13 Tex.Jur.2d, page 496. However, the modification of an existing contract (membership agreement in this case) must be based on a sufficient consideration. There was no evidence of any consideration for the execution of the January 12th membership agreement. We hold that Smith was bound by the January 9th agreement and was required to pay the liquidated damages as provided therein.

■ We are of the further opinion that the allegations contained in Smith's first amended original petition constituted a conclusive judicial admission against Smith. He stated: "Plaintiff thereupon elected not to fulfill the contract *dated January 9, 1973,* but to pay the penalty provided for *in the contract* and elected further to fulfill the contract dated January 20, 1973." The effect of such an admission is that Smith is now bound by the liquidated damages provisions in the contract dated January 9, 1973, and cannot claim that the damages are governed by another agreement.

■ It is the settled law that the pleadings in a particular case, for the purpose of use as such in that case, are to be regarded as judicial admissions, rather than just ordinary admissions. *Kirk v. Head,* 137 Tex. 44, 152 S.W.2d 726 (1941); *Hughes v. Fort Worth Nat. Bank,* 164 S.W.2d 231 (Tex.Civ.App.—Fort Worth 1942, writ ref'd); *McCormick v. Stowe Lumber Company,* 356 S.W.2d 450 (Tex.Civ.App.—Austin 1962, writ ref'd n. r. e.); McCormick and Ray, Texas Practice, Evidence § 1144. So, as long as the admission stands unretracted, the fact alleged or admitted, for the purposes of the case, is accepted as true by the court (and jury), and is binding on the party making it, i. e., he cannot introduce evidence to contradict it. McCormick and Ray, Texas Practice, Evidence § 1127. See also *Griffin v. Superior Insurance Company,* 338 S.W.2d 415 (Tex.Sup.1960); *Whitt v. Bussey,* 387 S.W.2d 926 (Tex.Civ.App.—Austin 1965, writ ref'd n. r. e.); *McMurtry v. Addington,* 354 S.W.2d 655 (Tex.Civ.App.—Amarillo 1962, writ ref'd n. r. e.); *Canales v. Bank of California,* 316 S.W.2d 314 (Tex.Civ.App.—Eastland 1958, writ ref'd n. r. e.). Thus, with respect to those statements referred to in the above amended petition, Smith is bound by the liquidated damage provisions in the January 9th agreement.

■ Smith admitted in his pleadings and in his deposition that he intentionally breached the January 9th agreement with NFO. The courts have always looked with disfavor upon a party that intentionally breaches a contract. A party should not profit by his own wrong. See *Jones v. Jimmerson,* 302 S.W.2d 161 (Tex.Civ.App.—Texarkana 1957, writ ref'd n. r. e.); *Atlantic Richfield Company v. Hilton,* 437 S.W.2d 347 (Tex.Civ.App.—Tyler 1969, writ ref'd n.

r. e., cert. den. 396 U.S. 905, 90 S.Ct. 221, 24 L.Ed.2d 182); *Sunray DX Oil Company v. Texaco, Inc.,* 417 S.W.2d 424 (Tex.Civ.App. —El Paso 1967, writ ref'd n. r. e.). Appellant's points of error are sustained.

■ Smith, the appellee, in what he denominates his point of error number 1, complains that the trial court erred in applying the liquidated damage loss to $4.20 per hundred weight (the price Smith sold the grain), rather than applying the liquidated clause of $3.00 per hundred weight (the price that Smith contracted to sell the grain). The trial court held that the penalty was applicable to the price for which Smith sold the grain. With this part of the judgment we agree. Gross value simply means that it is the gross value of the grain disposed of by Smith at the time of the sale. If the intention of the parties was to make the penalty of 25% applicable to the "contract price", the contract would have so stated. We hold that the gross value as intended by the parties was the value that the grain sold on the market before any deduction and without diminution of expenses.

■ Appellee's "point of error" is without merit for another reason. He made no complaint of the trial court's judgment and there is nothing in the trial record that indicates appellee's dissatisfaction with the trial court's judgment. Where an appellee does not except to the judgment, does not give notice of appeal, nor does he in any manner give notice to the trial court of his dissatisfaction with the judgment, the appellee is not entitled to appellate review of his claimed error. This is especially true where the judgment is severable, as here. The appellant NFO complains only of a severed portion of the judgment concerning the percentage of penalty. The appellee complains not only of the percentage of penalty, but of its application to the price at which appellee sold the grain. We, therefore, hold that appellee has failed to perfect a cross point in this appeal. *Maloney v. Strain,* 410 S.W.2d 650 (Tex.Civ.App.—

Eastland 1966, no writ); *West Texas Utilities Company v. Irvin,* 161 Tex. 5, 336 S.W.2d 609 (1960); *White Stores, Inc. v. Crain,* 515 S.W.2d 677 (Tex.Civ.App.—Austin 1974, no writ); *Security Insurance Company v. Pioneer Casualty Company,* 449 S.W.2d 158 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n. r. e.).

The trial court was, accordingly, in error in failing to offset the $13,744.00 owed by NFO to Smith by the sum of the liquidated damages Smith owes to NFO in the amount of $12,600.00. It is, therefore, ordered, adjudged and decreed that appellee J. O. Smith have and recover of the appellant National Farmers Organization the sum of $1,144.00, with interest thereon from August 15, 1973, at the legal rate, and costs in the trial court. Costs of appeal are adjudged against appellee J. O. Smith.

The judgment of the trial court is affirmed in part and reversed and rendered in part.