**VICTORIA BANK & TRUST COMPANY, Appellant,**

v.

**Marlyn R. BRADY, Fancher Cattle Co., et al., Appellees.**

**No. 13–88–335–CV.**

Court of Appeals of Texas, Corpus Christi.

Oct. 19, 1989.

Rehearing Denied Nov. 30, 1989.

John D. Murphee, Victoria, Jess Hall, Jr., James W. Paulsen, Houston, for appellant.

Randy D. Little, R. Dan Fontaine, Grant Kaiser, Abraham & Watkins, W. James Kronzer, Houston, for appellees.

Before NYE, C.J., and KENNEDY and BENAVIDES, JJ.

## OPINION

KENNEDY, Justice.

This appeal arises out of a suit on a promissory note filed by Victoria Bank and Trust Company against Marlyn and Pauline Brady, Bill Fancher, and Fancher Cattle Company, Inc.[1] Fancher and the other defendants counterclaimed alleging usury, fraud, duress and tortious interference with business relations. The counterclaim also alleged that Victoria breached a duty of good faith and fair dealing to Fancher and the Cattle Company and that Victoria had knowingly violated certain provisions of the Texas Deceptive Trade Practices Consumer Protection Act, Tex.Bus. & Comm.Code Ann. § 17.41 et seq. (Vernon 1987). The jury returned a verdict answering all the questions favorably to Fancher and the Cattle Company. The trial court rendered judgment for Fancher and the Cattle Company against Victoria on part of their claims, and for Victoria against the Bradys. Victoria now appeals the judgment by seventeen points of error. Fancher and the Cattle Company cross appeal the trial court's denial of their usury claim and their claim for breach of the duty of the good faith and fair dealing. We affirm in part and reverse and render in part.

We begin with a summary of the pertinent facts. Fancher is a cattle trader. He owned Fancher Cattle Company, Inc. He and his company began doing business with Victoria Bank and Trust sometime in 1973. He borrowed money to buy cattle, sold the cattle and then paid back the loans. After several years of doing business with Victoria, Fancher began working with loan officer Bob Trott on various other cattle-related transactions. At times, Fancher would evaluate the condition of cattle being put up as collateral on loans made by Victoria to third parties. Fancher also sold cattle to Trott. He worked as partner with the bank in other cattle transactions. In 1983, after discussion amongst Fancher, Brady and Trott, it was decided that Brady and the Cattle Company would enter a partnership to buy and sell cattle. Victoria agreed to supply the necessary capital to fund the venture. However, Victoria required Brady and the Cattle Company to reduce their partnership arrangement to writing and referred them to Randy Stevenson for the necessary legal work. The partnership agreement as executed specifically outlined what steps were necessary in order for the partnership to incur debt. The agreement also stated specifically that Fancher did not assume any debt already incurred by Brady. The note executed, however, was executed not by Brady and the Cattle Company as partners per the partnership agreement, but by the two as co-makers. The original of the note, while in Victoria's possession, was later altered by the addition of words indicating that it had been executed by the partnership.

In addition to the partnership agreement, Victoria also required certain collateral to secure the loan, i.e. Brady's ranch in Zavala County. However, another lender, Winter Garden Production Credit Association, held a priority lien position through a deed of trust securing a loan made earlier to Brady. Victoria sought the priority lien position and, as a condition of making the loan to Brady and Fancher, required that the Winter Garden debt be paid off. According to Fancher's testimony, Trott assured Fancher, " 'Mr. Brady has plenty of collateral, so you will never, never come to a

---

1. This appeal actually concerns only Fancher, Fancher Cattle Company, Inc., and Victoria Bank & Trust Company. The three parties will be referred to as "Fancher," "the Cattle Company," and "Victoria" respectively.

time where you will have to pay off anything that Mr. Brady owes. In fact, he's got plenty of collateral to cover anything he's asking for.' "

On November 21, 1983, Brady and Fancher, as president of the Cattle Company, executed a promissory noted to Victoria along with several other related documents. The note, despite the assurances made by Trott to Fancher, stated in part, "This note is given partially in renewal and extension of those sums left owing by Maker hereof to Winter Garden Production Credit Association." Brady individually and Fancher for the Cattle Company were co-makers. In exchange for the note, the makers received a revolving line of credit for a maximum of $150,000.00. Also executed at this time was an agreement providing that Victoria did not become obligated to fund the loan until it had a priority lien against the Zavala County property. Brady and Trott then executed a deed of trust on the land, and Brady became indebted to Victoria prior to the promissory note becoming effective.

On December 2, 1983, Victoria transferred funds to Winter Garden, purchasing an assignment of Brady's note and deed of trust to Winter Garden and thus achieving the required priority lien position. The amount of the debt was $121,796.75. Under the loan documents, Victoria then became obligated to fund the revolving line of credit. The $121,796.75 paid to Winter Garden was then charged to the $150,-000.00 line of credit. Thus Fancher and the Cattle Company became obligated to Victoria on Brady's pre-existing debt. Nonetheless, Victoria's officers continued to assure Fancher he would not be held responsible for the debt.

In the spring of 1984, Victoria vice-president Royce Church met with Fancher, and Church agreed to renew and extend the note and increase the amount of credit made available to Fancher and Brady. As part of the transaction, the account balance on the November 21, 1983 note, including the amount attributable to Brady's pre-existing debt, were to be paid off with proceeds of the renewal note. Church prepared the note to be executed by Fancher for Fancher Company, Inc. and Brady, again as co-makers. This note was executed on June 20, 1984. From June of 1984 until spring of 1985, Fancher and Brady traded cattle and made payments against the debt with proceeds from the transactions. During this time a new loan officer, David Barnhart, was assigned as the loan officer for Fancher and Brady. In October of 1984, Barnhart told Fancher that Victoria was going to pursue Brady and possibly foreclose on his land to get rid of him. Again, Fancher was assured that he would not be held responsible for the pre-existing debt.

Despite the fact that the note was not in default, on April 19, 1984, Barnhart, on behalf of Victoria, sent Brady and Fancher a letter stating that the note would not be renewed at maturity and recommended that they either seek financing elsewhere or liquidate their assets in order to meet the debt when it became due. The note in question would mature June 7, 1985. Fancher and Brady began to liquidate their inventory, but in July 1985, the balance owing on the second note was past due and unpaid and the note was declared to be in default. Victoria posted the Zavala County property for foreclosure.

Meanwhile, Fancher continued to liquidate the inventory, paying the proceeds to Victoria and reducing the debt on the line of credit to the amount he believed represented Brady's pre-existing debt with its accumulated interest. Victoria officers continued to reassure Fancher that Victoria would pursue only Brady for the amounts left owing from the prior debt. During this period, however, according to Fancher, Barnhart began attempting to exert control over the manner in which Fancher ran his business. He (Fancher) paid off the debt incurred under a Fancher Cattle Company individual line of credit, and Victoria released a certificate of deposit which it had held to secure the debt. Fancher assumed, based on Victoria's representations, that his relationship with Victoria had ended. Fancher began doing business with another local bank.

However, Victoria determined that the Zavala County property might not be of sufficient value to cover the debt remaining on the Brady–Cattle Company note, so, in contravention of the many representations made to Fancher, Victoria determined it would pursue Fancher for the debt. Contrary to bank policy, when Fancher paid off the Cattle Company's individual line of credit, Barnhart had retained a security agreement executed in conjunction with that line of credit.

In September of 1985, Fancher entered into a cattle trading transaction with Bill Richardson, a Victoria customer. Richardson bought a number of cattle from Fancher, via the Cattle Company, and he paid Fancher with a draft for $82,900.00 drawn on Victoria. Fancher presented the draft for payment and was directed to Barnhart. Barnhart told Fancher that Victoria would need authorization from Richardson before the draft could be paid. Barnhart then contacted Howard Marek, the bank's attorney who drafted the 1983 note, and upon his advice, denied payment on the draft until Fancher agreed to forfeit $40,000.00 towards the remaining debt under the Brady–Cattle Company note. Barnhart claimed a lien on the cattle in question under a security agreement retained after payment of the Cattle Company's individual line of credit. The security agreement contained an after-acquired property clause, which, according to Barnhart, gave Victoria a security interest in the cattle Fancher was selling to Richardson. Fancher agreed to forfeit the $40,000.00, but only because it was the only means available to him to complete the sale of the cattle to Richardson. Victoria *then* surrendered the security agreement (though the note at issue remained to be paid in full), and applied Fancher's $40,000.00 to the debt remaining on that note.

Meanwhile, Brady filed suit in Zavala County to enjoin the foreclosure. At the injunction hearing, Brady, Fancher, and Victoria arrived at an agreement. The bank would postpone the foreclosure and, through a new note to be executed in October, Brady and Fancher were given more time to pay off the debt. The renewal note

extended $135,000.00 in credit. In return for this, Fancher signed an agreement purporting to release Victoria from any claims he or his company might have against Victoria. Most of the renewal funds were applied to the prior note. This note, too, went into default. The property in Zavala County was foreclosed, with the bank bidding in and purchasing the property for $70,000. Victoria then sued for the deficiency.

Fancher and the Cattle Company contend by cross point one that the trial court erred in failing to render judgment for them on their counterclaim for usury against Victoria. By its answers to Questions one, two, and three, the jury found that Victoria required the Cattle Company to assume Brady's pre-existing debt to Winter Garden as a condition of its extension of credit to the Cattle Company. Evidentiary support for the findings has not been challenged; rather, Victoria argued at trial (and here), and the trial court agreed, that the jury's findings were legally immaterial and would not support a judgment on the usury claims for the reasons that the indebtedness assumed was not that of a debtor to Victoria and no benefit accrued to Victoria by its assumption. We disagree.

The case governing this usury claim is *Alamo Lumber Co. v. Gold*, 661 S.W.2d 926 (Tex.1983), in which the Supreme Court of Texas held, "[A] lender who requires as a condition to making a loan, that a borrower assume a third party's debt, as distinguished from a requirement that the borrower pay another one of his own debts, must include the amount of the third party's debt in the interest computations." *Id.* at 928.

*Alamo* involved facts on point with those now before us. Mrs. Gold had executed a promissory note payable to Pleasanton National Bank and secured by certain real estate. She defaulted, so the bank instituted proceedings to foreclose on the real estate. Her son, meanwhile, had become indebted to Alamo Lumber on an open account. He, too, defaulted. Alamo agreed to purchase Gold's note owed to Pleasanton and extend the due date on the condition

that she execute a second note payable to Alamo obligating her to pay her son's debt to Alamo. Neither note was usurious on its face.

Victoria argues that *Alamo* may be distinguished from the case at bar because in *Alamo*, the debt Mrs. Gold assumed was a debt to the *same* lender, Alamo Lumber Co. Victoria contends that *Alamo* cannot apply here because the debt Fancher was required to assume was owed to a different lender, Winter Garden, and therefore, no benefit accrued to Victoria by Fancher's assumption of Brady's debt. We find two flaws in this argument.

■ The Supreme Court closely examined two prior decisions of courts of appeals in its analysis of Gold's usury claim. The Court's holding emphasized that the usury finding depended on the borrower being required to pay a third party debt. The court did not hold that identity of lender must be present. *Cf. Stephens v. First Bank and Trust of Richardson*, 540 S.W.2d 572 (Tex.Civ.App.—Waco 1976, writ ref'd. n.r.e.); *Laid Rite, Inc. v. Texas Industries, Inc.*, 512 S.W.2d 384 (Tex.Civ. App.—Fort Worth 1974, no writ). The *Alamo* court reviewed and discussed *Stephens* and *Laid Rite*, and noted that the intermediate courts were addressing only those situations in which the debt was owed to the same lender. However, the Supreme Court chose not to limit its holding in *Alamo* in such a manner. We, therefore, cannot alter the law as stated to hold that usury in this setting occurs only when the assumed debt is owed to the same lender.

Furthermore, we find that the facts of this case are more closely akin to those in *Alamo* than Victoria believes them to be. By an agreement executed simultaneously with the November 21, 1983 note, that note did not become effective until Victoria received a priority lien on the Zavala County property. This could not be done until Winter Garden was paid the debt due it when Victoria purchased Brady's note. Thus, Fancher and the Cattle Company did not become obligated to pay Brady's debt until it was owed to Victoria. Fancher and the Cattle Company were never obligated

to pay Winter Garden. Hence, the facts of this case are quite on point with those in *Alamo*.

■ We must also reject Victoria's argument that because no benefit accrued to Victoria by Fancher's assumption of the Winter Garden debt no usury could have occurred. In *Danziger v. San Jacinto Savings Association*, 732 S.W.2d 300, 304 (Tex.1987), the Supreme Court addressed the issue of benefit to the lender, and that Court held that, however accomplished, the "mere charging of excessive interest constitutes usury." Whether the lender benefits is immaterial.

■ Victoria also argues that Fancher and the Cattle Company waived their cross points by failing to urge dissatisfaction with the judgment after its entry. However, contrary to these assertions, appellees did complain of the judgment by perfecting the cross-appeal through the filing of an appeal bond. *Cf. National Farmers Organization v. Smith*, 526 S.W.2d 759 (Tex.Civ.App.—Corpus Christi 1975, no writ). Under the judgment entered in this case, Fancher prevailed on his counterclaims for violations of the D.T.P.A. and tortious interference with business relations. There is no indication in the record that he waived his remaining counterclaims. Because he received a favorable judgment on part of his claims, Fancher had no duty to raise his cross point in the trial court prior to filing his appeal bond. *Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, 747 S.W.2d 785 (Tex. 1988); *Chesshir v. First State Bank of Morton*, 620 S.W.2d 101 (Tex.1981); *McKelvy v. Barber*, 381 S.W.2d 59 (Tex. 1964); *cf. Texas Utilities Co. v. Irvin*, 336 S.W.2d 609 (Tex.1960).

■ Victoria also argues that the "savings clause" found in the security agreement accompanying the original note automatically reduced the rate of interest to the highest rate permitted by law, thus prohibiting any usury. However, there is no evidence anywhere in the record that the boilerplate language found in the security agreement was ever in any way effectuat-

ed. The usurious interest was charged; therefore, usury occurred. *Danziger*, 732 S.W.2d at 304; *Cochran v. American Savings and Loan Association*, 586 S.W.2d 849 (Tex.1979). Cross point one is sustained, and the judgment of the trial court is hereby modified to grant Fancher and the Cattle Company usury penalties per Tex.Rev.Civ.Stat.Ann. art. 5069–1.06 (Vernon 1987) as follows:

(1) $549,030.57—statutory penalties for usury on 11/21/83 note;

(2) $898,268.75—statutory penalties for usury on 6/20/84 renewal note; and

(3) $433,503.58—statutory penalties for usury on 10/22/85 renewal note.

■ By their second cross point, Fancher and the Cattle Company complain that the trial court erred in disregarding the jury's findings concerning their claim for breach of the duty of good faith and fair dealing, thereby denying them judgment on that claim. Texas courts have long recognized that where certain special relationships are concerned, the parties to those relationships may owe one another a duty of good faith and fair dealing. *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165, 167 (Tex.1987) (insurers have duty to deal fairly and in good faith with their insureds); *Amoco Production Co. v. First Baptist Church*, 611 S.W.2d 610 (Tex.1980) (lessee bound by implied covenant of good faith when marketing gas); *Fitz–Gerald v. Hull*, 237 S.W.2d 256 (Tex. 1951) (joint adventurers owe one another an obligation of utmost good faith); *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513 (1942) (good faith and fair dealing required of agent in every transaction made on behalf of principal); *Johnson v. Peckham*, 120 S.W.2d 786 (Tex.1938) (partner purchasing co-partner's interest in firm assets owes duty of good faith to co-partner); *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543 (Tex. Comm'n. App.1937, opinion adopted) (holder of executive right owes duty of utmost fair dealing to royalty interest holder); Tex.Bus. & Comm.Code Ann. § 1.203 (Tex.U.C.C.) (Vernon 1968) (duty of good faith and fair dealing applies to all con-

tracts governed by the Uniform Commercial Code). However laudatory the concept may be, a duty of good faith and fair dealing does not arise in every contract or business transaction. *English v. Fischer*, 660 S.W.2d 521 (Tex.1983).

■ Fancher cites Justice Spears' concurring opinion in *English v. Fischer*, contending that the existence of a "special" relationship, a relationship of trust and confidence, is all that is necessary to give rise to a duty of good faith and fair dealing. However, this Court must look to the case law for instruction regarding which relationships are so "special" that they give rise to such a duty. We know of no cases in this state which impose a duty of good faith and fair dealing on lenders in general to their borrowers: A debtor-creditor relationship does not give rise to such a duty, nor will mere subjective trust alone create a fiduciary relationship. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962); *Cluck v. Frost National Bank*, 714 S.W.2d 408 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); *Winston v. Lake Jackson Bank*, 574 S.W.2d 628 (Tex.Civ.App.—Houston [14th Dist.] 1978, no writ; *see also Consolidated Bearing and Supply Co., Inc. v. First National Bank*, 720 S.W.2d 647 (Tex. App.—Amarillo 1986, no writ). Appellee's second cross point is overruled, and we turn now to Victoria's points of error.

By its first through third points of error Victoria challenges the legal and factual sufficiency of the evidence in support of the jury's response to Question 12. Question 12 inquired whether certain grounds which would void an otherwise valid release agreement existed. The jury responded "yes." However, because the question was phrased disjunctively, we must examine all four grounds to determine which of the four, if any, is adequately supported by the evidence.

In considering a "no evidence," "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985);

*Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza,* 626 S.W.2d 120 (Tex. App.—Corpus Christi 1981, writ ref'd n.r. e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 Texas L.Rev. 361 (1960).

It is Victoria's position that a release agreement signed by Fancher on October 23, 1985, bars all of Fancher's and the Cattle Company's claims in this lawsuit. The document in question is a broad form release of all claims. It is Fancher's position that the release is invalid.

A release agreement valid on its face may be declared invalid on one of several grounds. Such an agreement may be found invalid if not made in good faith or if executed to cloak a usurious transaction. *Alexander v. Finn,* 139 Tex. 461, 163 S.W.2d 714, 716 (Tex.Comm'n.App.1942, opinion adopted). A release, like any other contract, may also be invalidated for lack of consideration, *Garcia v. Villarreal,* 478 S.W.2d 830 (Tex.Civ.App.—Corpus Christi 1971, no writ), or mutual mistake, *Schmaltz v. Walder,* 566 S.W.2d 81 (Tex. Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). Finally, like all contracts, a release may be set aside for fraud. *Shenandoah Associates v. J & K Properties, Inc.,* 741 S.W.2d 470, 482 (Tex.App.—Dallas 1987, writ denied); *McClellan v. Boehmer,* 700 S.W.2d 687 (Tex.App.—Corpus Christi 1985, no writ).

Question 12 inquired whether the agreement (1) was used to cloak a usurious transaction, (2) was not made in good faith, (3) was supported by no benefit to which Fancher was not otherwise entitled, (4) or was the result of a mutual mistake concerning the existence of a usurious claim. The jury's response indicates that it found at least one of the circumstances necessary to avoid the release existed. We review here the evidence to determine whether it was sufficient to support that answer. Bank officer David Barnhart testified that it was his intent in executing the release that Fancher release any usury claim he or his company might have against Victoria.

The release was executed simultaneously with the second renewal note (the October 1985 note). There was no evidence that Fancher had knowledge of his usury claim at this time. This is sufficient evidence from which the jury could find that the release was executed to cloak the usurious transaction of which it was an integral part.

Furthermore, the record reveals that Fancher received no benefit in exchange for the agreement to which he was not already entitled. While it is true that an extension of time to which to pay a debt is adequate consideration for a contract, *Bonner Oil Co. v. Gaines,* 191 S.W. 552 (Tex.1917); *Barclay v. Waxahachie Bank & Trust Co.,* 568 S.W.2d 721 (Tex. Civ.App.—Waco 1978, no writ), such is not the case here. First, the jury found that the debt for which extension of time to pay was given was not Fancher's, so extending the time to pay could be of no benefit to him. Second, the $20,000 paid to Fancher under the agreement was, by the terms of the agreement, a "refund." As originally written, the agreement stated that Victoria would "advance" $20,000.00. The word "advance" was marked through and the word "refund" written in throughout the entire document. There was much dispute at trial as to what was meant by "refund." When one refunds money, it is being given back in restitution or compensation for overpayment. *Webster's New Twentieth Century Dictionary* 1519 (2d ed.1980). Logic dictates that compensation to which one is already entitled cannot constitute consideration.

With regard to the issue of mutual mistake of fact concerning the existence of a usurious claim, Barnhart testified that he intended the usury claim be released by execution of the agreement in question. Fancher, however, testified that he was not aware that he had a usury claim at the time the release was executed. Knowledge by one party of the other's mistake concerning expression of a contract is equivalent to mutual mistake. *Ace Drug Marts, Inc. v. Sterling,* 502 S.W.2d 935, 939 (Tex.Civ.App.—Corpus Christi

1973, writ ref'd n.r.e.). However, there was no evidence that Victoria knew Fancher was mistaken regarding the usury claim, so this could not be a ground upon which to invalidate the release.

Victoria also complains of the form of Question 12 in that it did not inquire into which party was not acting in good faith and it did not ask which parties to the release were mutually mistaken. However, Victoria failed to object to the form of the question before it was submitted to the jury; therefore, such error, if any, was waived. Tex.R.Civ.P. 274. Points of error one, two and three are overruled.

By its fourth point of error, Victoria asserts error in the exclusion from evidence of the testimony of two of Fancher's prior attorneys, Misak and Stevenson. Victoria contends that their testimony was relevant to show that Fancher knew of his claims at the time he executed the October 1985 release. Fancher objected to admission of their testimony because the attorneys had not been designated, as requested by Fancher, as persons with knowledge of relevant facts. Fancher further objected to the testimony on the basis of attorney-client privilege. Tex.R.Civ.Evid. 503(b).

On bill of review, Stevenson testified that he last represented Fancher in 1985 during the work out phase of the last renewal. He testified generally to discussions he held with Fancher regarding the release agreement. He also testified that he discussed "many of the aspects of his claims against Victoria Bank & Trust Company." He further stated, with regard to the usury claim, "I'm sure I discussed the potential," but he later stated, "I don't think I specifically recall talking about usury." He later reiterated, "I have no recollection myself of having talked to Mr. Fancher about, talked about usury at all."

We hold that Stevenson's testimony was properly excluded. First of all, he was Fancher's attorney during the time period in question, and the testimony sought related specifically to conversations held between attorney and client concerning subject matter of this suit. Tex.R.Civ. Evid. 503(b) states that confidential communications made for the purpose of facilitating the rendition of legal services to the client may be claimed privileged. Any conversations held between Stevenson and/or Misak (an associate with Stevenson's firm) and Fancher concerning Fancher's claims against the bank were properly held by the trial court to be privileged. In any event, even if the exclusion were improper, neither testified that they informed Fancher of a usury claim, so there is no reversible error. Tex.R.App.P. 81(b).

Furthermore, Stevenson and Misak were not designated as persons with knowledge of facts relevant to this case, despite Fancher's discovery request for the names of such persons. Victoria knew that Stevenson had represented Fancher, and in all probability, that he would have knowledge of relevant facts, thus no good cause was shown for failing to designate him. His testimony was properly excluded for failure to designate. *Morrow v. H.E.B.*, 714 S.W.2d 297, 298 (Tex.1986); *Yeldell v. Holiday Hills Retirement and Nursing Center, Inc.*, 701 S.W.2d 243, 246–47 (Tex. 1985).

Anna Misak was the attorney who actually prepared the draft of the Plea in Intervention, to be discussed in detail, *infra*. Her testimony likewise was excluded but preserved in a bill of exceptions. Again, Fancher objected to the admission of her testimony on the grounds that she had not been designated and her testimony was subject to the attorney-client privilege under the rules of evidence and the attorney work product exception under the procedural rules relating to discovery. She testified that she reviewed some of the documents in connection with the foreclosure, but she did not recall discussing such matters with Fancher. For the same reasons that Stevenson's testimony was properly excluded, so too was Misak's testimony properly withheld from the jury.

We now address the more complex problem of the exclusion of the draft Plea in Intervention prepared by Misak some two weeks prior to the signing of the release agreement. The document was never filed.

It was never shown to Fancher. The draft was prepared in response to the foreclosure and the suit filed by Brady to halt the proceeding. It is unclear from the record how the draft came to be in the possession of Victoria's attorneys, but, at trial, Victoria's attorney's did come into possession of it and attempted to bring it before the jury. Fancher objected on the twin bases of privilege and work product. Victoria responded that the draft should have been produced in response to their request for production of documents. Fancher countered that he had attempted to obtain all documents meeting the description of that which had been requested, and the draft plea had not been included in the materials he received from Stevenson's office. He further argued at trial and in his brief that Victoria had not requested such a document. The trial court ruled that the draft was, in fact, responsive to the request, and we find ourselves in agreement with the ruling.

■ The next question then is whether either the attorney-client privilege or the work product exclusion would apply. We need not go into those matters, however, because our review of the statement of facts reveals that such bases for exclusion were waived by Fancher. The document in question did in fact come into the possession of Victoria at trial. Much debate was had on the record as to how Victoria obtained possession of the draft, but the bottom line is that it did, and, though many theories were advanced as to how this happened, none were proven. All remained merely theories. It was Fancher's burden to prove that no waiver occurred. *Jordan v. Court of Appeals for the Fourth Supreme Judicial District*, 701 S.W.2d 644, 649 (Tex.1985). Fancher did not meet his burden, and the plea was improperly excluded.

■ However, the error was harmless. Tex.R.App.P. 81(b). There is no evidence that any of Fancher's attorneys communicated to him their belief that he had a claim for usury. There is no evidence that he knew of the Plea or its contents. Stevenson stated in this connection, "For one thing, I'm not sure Mr. Fancher would have followed me totally if I had talked about usury."

Victoria argues that actual knowledge is not necessary because knowledge of an attorney can be imputed to the client, *citing Quintero v. Jim Walter Homes, Inc.*, 709 S.W.2d 225, 228 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.).

However, we think *Quintero* is distinguishable from the case at bar. In *Quintero*, upon recommendation by one attorney, the clients signed a release and settlement agreement several weeks after a judgment in their favor had been entered. Another attorney who had tried their case and won knew that the judgment in the Quinteros' favor had been entered, but he failed to inform them. This Court held that the knowledge of the attorney that the judgment had been entered was imputed to the clients. This Court further reasoned that the appellate court could not set aside a judgment because of the negligence or mistakes of his attorney.

■ Such is not the case here. First, we would note that the judgment entered in *Quintero* was a matter of public record, an ascertainable *fact*. In the case now before us we have not an ascertainable fact, but a theory of law never made known to the client. It seems only reasonable that while facts within the knowledge of any attorney may be imputed to the client, opinions of attorneys concerning legal theories potentially applicable to their client's problems cannot be imputed to the client, absent communication of those theories to the client.

Moreover, even had the draft been admitted, it was in fact merely a draft, the contents of which Fancher was unaware. The document was offered for impeachment purposes, and we are not of the opinion that its exclusion amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition an improper judgment. Tex.R.App.P. 81(b)(1). Appellant's fourth point of error is overruled.

Points of error five and six concern the jury's findings in Questions 5 and 6 that Victoria tortiously interfered with the business relationship between Bill Richardson and Fancher Cattle Company. By point five, Victoria asserts that there is no evidence that Victoria's actions were without justification or excuse and that Victoria had a valid security interest as a matter of law. Alternatively, Victoria argues that the evidence is factually insufficient to support the jury's answer to Question 5.

Victoria first argues that no damage to the Cattle Company was shown, but we note that there was evidence the company had to close down as a result of Victoria's actions. We further note here that the privilege of justification or excuse is an affirmative defense; therefore, Victoria bore the burdens of pleading and proof. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Armendariz v. Mora*, 553 S.W.2d 400, 405 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.); Tex.R.Civ.P. 94.

We find that there is some evidence that Victoria acted without justification or excuse in interfering in the Richardson transaction regardless of the status of the security agreement upon which Victoria bases its argument. The evidence showed that after repeatedly assuring Fancher that he would not be held responsible for the prior debt of Brady, Victoria proceeded to assert that very debt as the basis for refusing payment of the Richardson draft until Fancher agreed to let Victoria keep $40,000.00. Point five is overruled.

We now address Victoria's contention that the evidence does not support the jury's finding that Victoria interfered in the Richardson cattle transaction with malice. Victoria argues that it was privileged to interfere in the transaction because it held a security agreement with a cross-collateralization clause so that, although the note for which the security agreement was executed had been paid off, the security agreement remained effective to secure the loan at the heart of this cause. However, this argument does not negate Fancher's proof and the jury's finding that the interference was done with malice.

First of all, Fancher testified that when he signed the notes upon which this suit was founded, he was assured by Victoria that Brady's property in Zavala County would be more than adequate to secure the loan being made. And he (Fancher) was repeatedly assured by Victoria that he would not be held responsible for the outstanding debt on that property which had to be paid before Victoria could acquire its required priority lien position. Furthermore, Victoria gave as its excuse for interfering in the Richardson transaction a stale security agreement which had been executed to secure a note which had since been paid. It was Victoria's policy to release security agreements once the loans for which they were executed were paid. In addition, Barnhart testified that he first told Brady that he simply needed to obtain Richardson's approval in order to honor the draft, yet instead, Barnhart sought to assert the security agreement to block payment of the draft. Finally, despite assurances from Victoria's officers that Fancher would not be held responsible for that portion of the debt attributable to the Winter Garden note, Barnhart testified that Victoria determined it would pursue Fancher for the money because he had the ability to pay. Victoria's vice president, Royce Church, testified that, as a general rule, when a secured debt is paid off, the bank releases its security interest in the collateral securing the note.

This is some evidence from which the jury could find that the bank acted with malice in refusing to pay the Richardson draft. Point of error six is overruled.

By its seventh through twelfth points of error, Victoria complains of the jury's findings relevant to Fancher's D.T.P.A. cause of action. The trial court determined that Fancher was a consumer entitled to sue under the D.T.P.A., and the jury found that Victoria knowingly committed acts prohibited under the DTPA. Actual and punitive damages were also assessed against Victoria on this cause of action.

By point eight, Victoria argues that there is no evidence that Fancher was a consumer for purposes of the DTPA and that the question of consumer status should have been submitted to the jury. Under the DTPA, a consumer is one "who seeks or acquires by purchase or lease, any goods or services." *Riverside National Bank v. Lewis*, 603 S.W.2d 169, 172 (Tex.1980); Tex.Bus. & Comm.Code Ann. § 17.45(4) (Vernon 1987). Fancher alleged in his pleadings that Victoria committed acts prohibited by the D.T.P.A. with regard to him and his company by its seizure of the $40,-000.00 from the Richardson cattle transaction.

■ We now examine whether Fancher had consumer status with regard to this transaction. Victoria argues that Fancher was not a consumer with regard to the Richardson cattle transaction; to the contrary, it asserts he was the seller. One who engages in deceptive acts may not be subjected to a private suit for damages under the DTPA unless the aggrieved party is a consumer. *Riverside*, 603 S.W.2d at 173; Tex. Bus. & Comm.Code Ann. § 17.50 (Vernon 1987). Another requirement recognized by the Supreme Court vis a vis consumer status is that the goods purchased or leased must form the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981). Thus, we must look to the nature of Fancher's complaint to determine whether he properly alleged and proved consumer status.

Fancher on behalf of the Cattle Company, along with Brady, borrowed money from Victoria in 1983 to purchase cattle. The note was renewed twice, the final renewal ultimately becoming the subject matter of this suit. The renewal notes were executed in order to obtain additional money to purchase cattle. In addition to these transactions, Fancher and the Cattle Company, wholly apart from any business with Brady, borrowed money to buy cattle to trade and executed a security agreement giving the bank a security interest in the livestock. As we stated earlier, Fancher testified that Victoria represented to him that he would not be held responsible for

that portion of the debt used to pay off Brady's note to Winter Garden so that Victoria could obtain a priority lien on the Zavala County property. Yet in 1985, when he attempted to cash the draft given him by Richardson, Victoria refused to honor it, stating that he needed to first pay off the Brady–Fancher debt, contrary to prior representations made by the bank. Furthermore, Victoria used as leverage in withholding the payment the security agreement which the bank admitted should have been returned to Fancher once that individual $200,000.00 debt had been paid off. We hold that this is some evidence from which the trial court could determine that Fancher was a consumer under the D.T.P.A.

■ And indeed, consumer status is a question of law for the trial court to decide. The trial court did not err in refusing to submit an issue on consumer status to the jury. *Texas Cookie Company v. Hendricks & Peralta*, 747 S.W.2d 873, 879 (Tex.App.—Corpus Christi 1988, writ denied); *First Federal Savings & Loan Association v. Ritenour*, 704 S.W.2d 895 (Tex. App.—Corpus Christi 1986, writ ref'd n.r. e.). Appellant's eighth point of error is overruled.

Points of error nine and ten complain of the language used in Question 9 which, in pertinent part, states:

Do you find that Victoria Bank & Trust Co., engaged in a false, misleading or deceptive act or practice in connection with the Bill Richardson cattle transaction?

■ With regard to point ten, the complaint is that the question does not refer to the person or persons to whom the false, misleading or deceptive act or practice was directed. Appellant does not cite authority to support his complaint that the Question is improperly worded, nor do we find any specifically on point. However, it is obvious from the charge as a whole that the parties alluded to are Fancher and the Cattle Company. With further regard to point nine, we note that Victoria complains that "plaintiffs" pleadings do not support the issue as framed. Victoria was the

plaintiff in the trial court. Victoria's live pleadings do not appear to allege facts in support of Question 9. However, Fancher and the Cattle Company, as counterplaintiffs do allege facts by way of their pleading supportive of Question 9. And finally, we are unable to locate where these specific points are briefed by Victoria. Failure to brief a point of error constitutes waiver of that point. Tex.R.App.P. 74. Points nine and ten are overruled.

By the seventh point of error, Victoria argues the factual and legal sufficiency of the evidence to support the jury's finding that Victoria engaged in a false, misleading or deceptive act or practice in connection with the Richardson cattle transaction. We again review the pertinent facts.

■ When Fancher sold his cattle to Richardson, Richardson paid him with a draft drawn on Victoria Bank & Trust for $82,900.00. When Fancher presented the draft to Victoria, Barnhart, the loan officer, represented that the draft would be paid once authorization from Richardson was obtained. The draft required Victoria to pay Fancher $82,900.00. Victoria only paid $42,900.00. Fancher was forced to forfeit $40,000.00 or receive nothing. The basis for the bank's action in this regard was the security agreement which the bank asserted gave it a priority lien on the cattle sold to Richardson. The note secured by the agreement had already been paid, but contrary to the general practice the agreement was not released although the note was paid. Instead, the agreement was retained and then used to force Fancher to pay the Brady–Fancher debt. And according to Fancher, he was promised by Victoria that the Zavala County property was of more than sufficient value to secure the obligation here at issue and furthermore, that Fancher would not be responsible for the debt incurred by Brady alone. We hold that this is sufficient evidence to support the jury's answer to Question 9. Point of error seven is overruled.

■ By the eleventh point, Victoria argues that the evidence is legally and factually insufficient to support the jury's findings that the acts prohibited under the D.T.P.A. were done knowingly. Victoria's brief in this regard is scant at best, but in the interest of justice we will review the record to determine what evidence, if any, would support the jury finding at issue.

First, Victoria knew that the note secured by the security agreement by which it withheld payment on the Richardson draft had been paid so that it should no longer impose a security interest upon other property owned by Fancher or the Cattle Company. Furthermore, there is evidence that Victoria knew that it had promised Fancher not to seek payment on Brady's debt, yet it did. And Victoria later "refunded" $20,000.00 of the $40,000.00 it had wrongfully withheld from Fancher. This is some evidence to support the jury's response to Question 10. Point of error eleven is overruled.

■ By point of error sixteen, Victoria asserts that the trial court erred in failing to grant the bank its Motion for Judgment n.o.v. because (1) the bank was entitled to recovery on the note deficiency upon which the suit originated, and (2) there was no evidence or factually insufficient evidence to support the jury's finding that Victoria falsely represented that Fancher Cattle Company would not be held responsible for Brady's debt to Winter Garden. It is Victoria's position that Fancher's testimony regarding promises made by the bank to him concerning the 1983 note has no bearing on its deficiency suit on the 1985 note. The 1985 note was a second renewal and extension of the 1983 note.

Fancher testified that bank officers represented to him in 1983 that he would not be held responsible for that portion of the debt attributable to Brady's prior dealings with Winter Garden. He testified that the representations and assurances continued whenever problems arose in terms of paying the note. With respect to the 1985 note, the note upon which Victoria sued, Fancher testified that Kenneth Vickers, the chief commercial loan officer told him to go to Eagle Pass to help work out a settlement. According to Fancher, Vickers assured him, " 'We are not trying to get you, we are just trying to get Mr. Brady's part

of it.' " He further testified, "And I never doubted the bank was on my side. They had always told me in the beginning and up until now that 'you will never be responsible for Mr. Brady's debt.' " The following was also recorded:

Q: (By Bank counsel) My question to you, Mr. Fancher was: What bank officer told you that you would not be obligated for this debt?

A: Mr. Barnhart has told me I would never be obligated for it. Jerry Davidson told me, even when the thing started to crash and Mr. Barnhart was going to hold onto the $80,000, I couldn't get one penny of it, I was almost having to close my doors, I was going into hysterics, because $80,000 to a working man is something that you just don't do every day. Mr. Jerry Davidson, we went to his office and he said, "Bill, we don't want you, we want Marlyn Brady. · So let's do it this way. To get you back, started back to operating, let's give you back $40,000 and let you get started on. We are not after you, we are after Mr. Brady."

Q. Okay, did Mr. Barnhart ever tell you that you weren't going to be obligated to repay this note?

A: Mr. Barnhart told me many a times, "We are not after you, we only don't like Mr. Brady. I don't like Mr. Brady. I want to get Mr. Brady out of the picture. You don't need his partnership, so let's get rid of him. I don't like him personally. Don't like him."

Yet, when the debt was not paid, Victoria did in fact sue Fancher and his company, asserting that they were responsible for the *entire* amount borrowed, contrary to previous representations. This is sufficient evidence to support the jury's response to Question 4. Point of error sixteen is overruled.

■ By point of error seventeen, Victoria claims that the jury's finding that the $132,313.53 note sued upon was not an obligation of the Brady–Fancher partnership is contrary to the great weight and preponderance of the evidence. This Court is at a loss to understand why a point is raised but then never again mentioned in the appellant's briefs. The point is therefore waived, Tex.R.App.P. 74, although in the interest of justice we opt to point out that evidence which supports the finding. First of all, the partnership agreement between Brady and Fancher, *drawn up at the Bank's behest* clearly states:

13. Fancher Cattle Company is engaged in this and other businesses. Fancher Cattle Company may continue to operate other businesses and ventures, and unless any activity of the corporation reflects that such activity is that of the Partnership. Any document or activity executed by the Partnership shall bear the following signature line:

FANCHER–BRADY

By: _____

　　Fancher Cattle Company,

　　Acting herein by Bill Fancher as President,

　　MANAGING PARTNER

Unless any such signature line and authorization is included, it shall *conclusively be presumed that the activity is not that of the Partnership called Fancher–Brady.* (emphasis ours.)

Non–Assumption

14. Fancher Cattle Company has not assumed, and does not herein assume any liability of any kind or character presently owing by M.R. Brady to any party, any and all pre-existing indebtedness being solely that of the said M.R. Brady and not of this Partnership.

The bank was fully aware of the terms of this agreement.

However, the note at issue here contained the following signature line:

FANCHER CATTLE COMPANY, INC.

BY/s/ Bill Fancher

BILL FANCHER

Its President

/s/Marlyn R. Brady

MARLYN R. BRADY

MAKER ORIGINAL COPY

Furthermore, the evidence indicates that someone at the bank altered the original of

the note while it was in Victoria's possession and after its execution to read that it was a partnership note when, in fact, it had not been so executed. This is sufficient evidence from which a jury could find that the note in question did not evidence a partnership debt. Point seventeen is overruled.

■ By point thirteen, Victoria complains of the submission of and responses to Question 11 inquiring into the actual damages suffered by Fancher. It first argues that the trial court erred in submitting Question 11 because the question has no support in the pleadings vis a vis future loss of business or business reputation. However, Victoria failed to object to submission of this issue on that basis at trial. Victoria's sole objection to submission was "no evidence." Victoria has therefore waived this issue for appellate purposes. *Allen v. American National Insurance Co.*, 380 S.W.2d 604, 608–609 (Tex.1964); Tex.R.Civ.P. 274; *see Mangham v. Hall*, 564 S.W.2d 465 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd. n.r.e.).

Victoria also complains by this point that there is no evidence or insufficient evidence of lost profits to support the jury's response to Question 11. The relevant portion of Question 11 inquires whether the following damages were incurred and if so in what amount:

A. Loss of business in the past.

Answer: $135,000

B. Loss of business which, in reasonable probability, will be suffered in the future.

Answer: $180,000

C. Loss of business reputation in the past.

Answer: $30,000

D. Loss of business reputation which, in reasonable probability, will be suffered in the future.

Answer: $40,000

The point complains of the evidence regarding *lost profits*, yet the issue inquires whether loss of business or business reputation was sustained.

■ "Lost profits" is not synonymous with loss of business. *Mangham*, 564 S.W.2d at 469. The jury was not asked to determine whether Fancher suffered lost profits, or if so, in what amount. Victoria has waived this point by failing to object to the form in which the issue was submitted to the jury.

■ Nonetheless, we will examine whether there is evidence in the record to support the jury's findings of damages for loss of business and business reputation. With respect to injury to his business reputation, Fancher testified that his business reputation was very important and is dependent on the type and amount of inventory kept and that there must be sufficient inventory on hand to make it worthwhile for potential buyers to drive out and look at his cattle. He testified that information in the cattle trading business is passed by word-of-mouth and that when buyers learn that a cattle trader is having problems with his bank, they will try to take advantage of the situation by offering less for the cattle. When the bank stands behind the trader, the trader can price his cattle "the way he wants to." Without a solid reputation, the trader is forced to take whatever is offered for his cows. He testified that, after the Richardson transaction was held up, "the word was out" that Fancher was having difficulty delivering the cattle he promised. He testified that he lost customers as a result and that he lost business as well. This is some evidence from which the jury could find that Fancher sustained loss of business and business reputation, past and future.

■ Furthermore, with regard to the amounts awarded, Fancher introduced into evidence his "lot ledgers." These ledgers show costs and profits associated with transactions involving each lot of cattle traded. For the four month period preceding the Richardson cattle deal, the lot ledgers reflect that the Cattle Company earned $31,724.89. Annualized, this amounts to $95,174.67. When added to the $40,000.00 withheld by Victoria in the Richardson transaction, the figure comes to $135,-174.67. This is some evidence to support

the jury's response to subpart A of Question 11.

■ The jury also found $180,000.00 in damages attributable to future loss of business. Fancher testified that it would take at least 5 years for him to rebuild his business to its prior status. This averages $36,000.00 per annum, an amount supported in the evidence by the lot ledgers discussed, *supra*.

Victoria's point of error thirteen is overruled.

By its twelfth, fourteenth and fifteenth points of error, Victoria complains of the jury's awarding Fancher and the Cattle Company punitive damages.

By point twelve, the Bank asserts that the trial court committed fundamental error in awarding punitive damages for DTPA violations in excess of the amount permitted by statute, Tex.Bus. & Comm. Code Ann. § 17.50(b) (Vernon 1987) provides:

> (b) In a suit filed under this section, each consumer who prevails may obtain:
> (1) the amount of actual damages found by the trier of fact. In addition the court shall award two times the portion of the actual damages that does not exceed $1,000. If the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000;

Appellant points out that the punitives assessed by the jury amount to 2.2 million dollars and the actual damages amounted to $495,000.00. The punitives assessed are 4.4 times the amount assessed as actual damages. At first blush this would appear to be excessive. *Jim Walter Homes v. Valencia*, 690 S.W.2d 239 (Tex.1985); Tex. Bus. & Comm.Code Ann. § 17.50(b)(1) (Vernon 1987).

■ However, several additional considerations come into play at this point. First, we note that Question 11 inquiring into actual damages is predicated upon affirmative answers to Questions 5, 7, and 9. The trial court properly disregarded the answer to question 7. Question 5, answered in the affirmative, inquired whether Victoria tortiously interfered in the cattle transaction with Bill Richardson. The jury's positive answer to Question 9 established liability under the D.T.P.A. Exemplary damages may also be awarded to one who establishes his cause of action for tortious interference with business relationships. The D.T.P.A., too, permits assessment of punitives.

■ Question 13 inquired, "What sum of money, if any, should be assessed against Victoria Bank & Trust Co. to Bill Fancher and Fancher Cattle Company Inc. as exemplary damages?" Counsel for Victoria objected to the submission of Question 13, but only upon "no evidence" grounds. No objections were voiced vis a vis the format of the question. We cannot divine from the language of the question which portion of the punitives were awarded for the tort and which for the D.T.P.A. Appellant's twelfth point of error is overruled.

■ By point fourteen, the bank challenges the sufficiency of the evidence to support the award and contends that the amount is manifestly unjust. We have discussed the evidence supportive the jury's responses to those issues, *supra* which we need not reiterate here. The evidence is factually sufficient to sustain an award of punitive damages.

■ We now examine whether the award is so excessive as to be manifestly unjust. Exemplary damages must be reasonably proportioned to actual damages. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). However, there is no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. *Id.* Factors to consider in determining whether such an award is reasonable include: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.*

■ In the case before us, we have a businessman who, over the years, developed a close working relationship with a bank. The two worked together to their mutual benefit. But the relationship became strained and ultimately burst apart when the bank began to deceive the businessman. A jury found that the bank's deception harmed his business. That jury found that the bank acted with malice. There is no evidence that the jury's award was the result of passion or prejudice. We do not think, in a case such as this, that an award of exemplary damages in the ratio of 4.4 to 1.0 as we have here is necessarily excessive or unjust.

Furthermore, the trial court granted Fancher judgment on his D.T.P.A. claims. The jury made the requisite finding that Victoria committed the prohibited acts knowingly, so that exemplary damages were authorized under that statute. The question which inquires of the jury how much to award by way of exemplary damages does not break down the amounts to be awarded per cause of action. Victoria did not object to the form of the issue as submitted. We cannot, from the record, determine how much of the punitives awarded are attributable to which causes of action. Point fourteen is overruled.

■ Point fifteen also complains of several matters related to the award of punitive damages. Victoria argues that the Excessive Fines Clause of Eighth Amendment to the United States Constitution constitutes a check on the power of juries to award punitive damages in civil cases. This court has held that such is not the case. *Underwriters Life Insurance Co. v. Cobb,* 746 S.W.2d 810, 817 (Tex.App.—Corpus Christi 1988, no writ) (holding the Eighth Amendment inapplicable to an award of exemplary damages).

This Court's interpretation of that clause was recently upheld by the Supreme Court of the United States in *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.,* — U.S. —, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). In that case, the Court stated, "We therefore hold, on the basis of the history and purpose of the Eighth Amendment, that its Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties." *Id.*

However, Victoria also complains that the award now under examination violates the excessive fines provision of the Texas Constitution. Tex. Const. art. I, § 13. The excessive fines provision states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

Victoria concedes that this is language identical to that found in its federal counterpart. Victoria asserts, however, that *Lucas v. United States,* 757 S.W.2d 687 (Tex.1988), is instructive here. However, that case concerned only whether a statutory limitation imposed on medical malpractice damages violated the *open courts* provision of Article 1, § 13. We do not have the open courts provision at issue before us. Therefore, *Lucas* is irrelevant. But Victoria also cites *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980). There the Supreme Court stated, " 'Fines' as used in article I, Section 13 includes civil penalties." However, in that case, the appellant was challenging the constitutionality of the D.T.P.A., specifically § 17.50(b)(1) providing for trebling of damages. In analyzing whether the D.T.P.A. provision met constitutional muster, the court examined those situations in which civil fines were *legislatively* authorized, as opposed to the *common law* punitives at least partially at issue here. *See also State v. Laredo Ice Co.,* 96 Tex. 461, 73 S.W. 951, 953 (1903); *Anguiano v. Jim Walter Homes,* 561 S.W.2d 249 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.). The treble damages provision of the D.T.P.A. was held constitutional in *Pennington* and not violative of the Texas Constitution.

Furthermore, the Court in that case, and others, *supra,* has made it abundantly clear that whether punitive damages are excessive is a question to be decided under the facts of each individual case. On the facts now before us, we necessarily reach the conclusion that the exemplary damages

awarded below are not excessive under Article I, § 13 of the Texas Constitution.

We now turn our attention to the issue of whether federal and state constitutional Due Process provisions are offended by the jury's award of exemplary damages. Victoria complains on appeal that the jury was given no standard or guidelines to follow in assessing punitive damages. We begin by noting that Victoria did not object to the lack of guidelines given the jury, nor did it request that the jury be instructed on any standard or guidelines it felt the law might require be followed. Instead, Victoria argues that there are no standards by which juries may be guided in their determinations of exemplary damages, and that this lack of guidance violates due process. Our review of the case law brings us to a different conclusion.

In *Alamo National Bank, supra,* the Supreme Court set forth five specific guidelines to be considered in determining the reasonableness of punitive damages. We have reviewed them, *supra,* and refer the reader to that portion of the opinion. The guidelines set forth in the case law together with the power of review granted the trial court and the appellate courts serve to satisfy amply the due process safeguards guaranteed by the federal and state constitutions.

We now reach Victoria's contention that it is immune from an award of punitive damages. The bank argues that:

(1) national banks are instrumentalities of the federal government; and

(2) federal instrumentalities are immune from punitive damages; and

(3) state banks have the same rights and privileges as national banks domiciled in Texas; so

(4) Victoria, as a state bank, is immune from an award of punitive damages.

Tex. Const. article XVI, § 16(c) states:

"A state bank created by virtue of the power granted by this section, notwithstanding any other provision of this section, has the same rights and privileges that are or may be granted to National banks of the United States domiciled in this State." Tex. Const. art. XVI, § 16(c) (Vernon Supp.1989).

Victoria does not cite nor have we found cases wherein a federally chartered bank has been held *immune* from punitive damages. *See Lewis v. United States,* 680 F.2d 1239, 1243 (9th Cir.1982) (Federal Reserve Banks are not federal agencies for purposes of the Federal Tort Claims Act.); *see also, Bank of East Texas v. Jones,* 758 S.W.2d 293, 296 (Tex.App.—Tyler 1988, no writ). Likewise we have found no cases prohibiting the imposition of punitive damages on state-chartered banks, and we can divine no logical reason why a state bank should be immune from punitive damages. Point fifteen is overruled.

The judgment of the trial court is AFFIRMED IN PART and REVERSED AND RENDERED IN PART.